AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of California ▾

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ████████████████ AND VICTOR | ) | Case No.  5:25-mj-00012-CDB |
| MANUEL GARCIA ALVAREZ | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of    Feb. 8, Feb. 26, Sept. 5, 2024    in the county of    Kern    in the
Eastern    District of    California    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1), 846 | Possession with intent to distribute methamphetamine and conspiracy to possess with intent to distribute a methamphetamine - Punishable by a mandatory minimum of 10 years in prison and a maximum of up to life in prison; or Fine of up to $10,000,000; or both fine and imprisonment; Supervised release of at least 5 years up to life |

This criminal complaint is based on these facts:
See attached affidavit of Special Agent Rylee Smith, incorporated by reference herein

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA Rylee Smith, FBI Special Agent
_____
*Printed name and title*

Sworn to before me via telephone pursuant to Fed. R. Crim P. 4.1.

Date:    February 26, 2025

_____
*Judge's signature*

City and state:    Bakersfield, California       Hon. Christopher D. Baker, U.S. Magistrate Judge
_____
*Printed name and title*

1  MICHELE BECKWITH
   Acting United States Attorney
2  ARIN C. HEINZ
   Assistant United States Attorney
3  2500 Tulare Street, Suite 4401
   Fresno, CA 93721
4  Telephone: (559) 497-4000
   Facsimile:  (559) 497-4099
5

6  Attorneys for Plaintiff
   United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,            CASE NO.  5:25-mj-00012-CDB

                    Plaintiff,          AFFIDAVIT OF FBI AGENT RYLEE SMITH
12

13            v.

   VICTOR MANUEL GARCIA ALVAREZ,
14

15

                    Defendants.
16

17 I, RYLEE SMITH, being duly sworn, state as follows:

18                    **AGENT BACKGROUND**

19       1.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed

20 since March 2024. Prior to this, I worked in various non-Agent positions with the Federal Bureau of

21 Investigation, assisting with investigations ranging from narcotics trafficking to counterintelligence.  I am

22 currently assigned to the Bakersfield Resident Agency of the Sacramento Field Office and my current

23 responsibilities include the investigation of firearms trafficking, illegal firearms possession, and narcotics

24 trafficking. I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia.

25       2.      During the course of my employment with the FBI, I have participated in numerous

26 criminal investigations. I have participated in investigations involving the use of federal and state search

27

28

warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in the distribution of controlled substances and weapons. To successfully conduct investigations, I have used a variety of investigative techniques and resources including physical surveillance, use of confidential sources, trash searches, mail covers, use of audio and audio/video recording devices, and search warrants.

3.      This affidavit is made in support of a request for a criminal complaint and arrest warrants charging VICTOR MANUEL GARCIA ALVAREZ (GARCIA) and ██████████████████

(███████ for a violations of 21 U.S.C. § § 846, 841(a)(1) Conspiracy to Possess with Intent to Distribute a Controlled Substance and Possession of Controlled Substance.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers. Much of the information contained in this affidavit is based on information obtained through investigation conducted by agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) and the Drug Enforcement Administration (DEA). This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

**PROBABLE CAUSE**

5.      The facts set forth below are based on an investigation conducted by the ATF, DEA, and FBI into ███████████████████████ and VICTOR MANUEL GARCIA ALVAREZ, who have been involved in the distribution of methamphetamine and firearms in the Kern County area and are also reportedly providing high caliber weapons to drug traffickers based in Mexico. The facts contained in this affidavit are based on reports written by ATF or DEA Special Agents based on their investigation, including information provided by Confidential Informants (CI's) and the use of two Undercover Officers (UC1 and UC2).

**UC1 and UC2 Purchase 4 Pistols and Approximately 2 Pounds of Suspected**

**Methamphetamine from ▮▮▮▮▮ and GARCIA**

6.  In approximately December 2023, Border Patrol reporting indicated that the phone number ▮▮▮▮▮▮▮ belonged to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("▮▮▮▮▮"). Special Agent Blake McEntire was informed by Border Patrol, who learned from a Confidential Informant,[1] that ▮▮▮▮▮ was providing high caliber weapons to drug traffickers based in Mexico.

7.  On January 29, 2024, an undercover officer (UC1) began communicating with phone number ▮▮▮▮▮▮ through phone calls and text messages. This phone number was identified as belonging to ▮▮▮▮ by the Confidential Informant and through law enforcement databases. Specifically, the law enforcement databases indicated that phone number ▮▮▮▮▮▮ was associated with ▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

8.  In the initial conversations between the UCI and ▮▮▮▮ in January 2024, ▮▮▮▮ said that he heard UC1 was looking to purchase methamphetamine, and that ▮▮▮▮ could provide good product. UC1 agreed and stated that UC1 was also interested in purchasing firearms. ▮▮▮▮ stated that



PHOTOS OF FIREARMS SENT BY ▮▮▮▮▮ 1

---

[1] The CI has been working with Border Patrol since 2023. They are working for immigration benefits and monetary compensation. They have no prior criminal history.

he had a seller that could sell AR-15's, Rocket-Propelled Grenades (RPG's), and M249 machine guns. ████████ sent the UC1 photographs of the firearms discussed (see above). ████████ indicated he would talk to his associate and obtain photographs and prices of available firearms.



PHOTOS OF FIREARMS SENT BY ████████ 2

1
2
3
4
5
6
7
8
9
10
11
12
13



PHOTOS OF FIREARMS SENT BY ████████ 3

14
15
16
17
18

9.      During follow on conversations in late January 2024, UC1 and ████████ discussed firearms that ████████ could sell to UC1. ████████ sent pictures of an Rocket Propelled Grenade (RPG), M249 machine guns, and AK-47 rifles. UC1 told ████████ that UC1 would be interested in buying an RPG and M249 machine guns, but ████████ later said that the seller of those items was located in Phoenix

19
20
21
22
23
24
25
26
27
28



PHOTOS OF FIREARMS SENT BY ████████ 4

and he would prefer if UC1 contacted the seller directly. However, ▓▓▓▓ stated he could sell UC1

methamphetamine, grenades, an AK47, and ammunition. UC1 and ▓▓▓▓ arranged to meet on

February 8, 2024, when ▓▓▓▓ would bring two pounds of methamphetamine, a .40 caliber pistol, a

9mm pistol, an AR15 rifle, and a .45 caliber pistol, for a total of $8,100.

10.    On February 8, 2024, UC1 and UC2 met with ▓▓▓▓ at the designated gas station in

Maricopa, California. Before the meeting, the UCs viewed a California driver's license photograph of

▓▓▓▓ to allow the UCs to recognize ▓▓▓▓

11.    When they met, ▓▓▓▓ offered to sell a pistol that he identified as his own to UC2 for

$2,000. UC2 agreed and took custody of the pistol. UC2 paid for this pistol at the end of the deal with the

rest of the items.



▓▓▓▓ AT BUY LOCATION

12.    During the deal, ▓▓▓▓ received a phone call. He said to the person on the phone, "aqui

por el tablero, para darle esto" (The UCs understood this to mean "here by the sign, to give them the stuff"

in English, based on their training and experience). Moments after, a second vehicle was observed

approaching the area where the UCs and ▓▓▓▓ were standing. Two Hispanic males were observed

exiting a dark colored Honda Pilot bearing CA license plate 8TSB236.

13.     One of the individuals who arrived in the vehicle was later identified as GARCIA, identified from Kern County Sherriff's body camera footage from a Kern County Sherriff's traffic stop[2] of ████████ and GARCIA on October 29, 2023. The second subject who arrived in the vehicle was unknown to the UC's and agents surveilling the operation (hereinafter referred to as FNU LNU). GARCIA was holding a plastic grocery bag and a black pistol box. FNU LNU was wearing a crossbody bag strapped to his chest. The UCs recognized GARCIA from the briefing before the buy, where they were shown a picture of GARCIA and told that he was an associate of ████████ The UCs, ████████ FNU LNU, and GARCIA sat in on the deal in the UCs vehicle, which was still parked at the gas station. Inside the vehicle, they discussed what other firearms were available for sale that GARCIA and FNU LNU brought.

14.     FNU LNU handed UC2 two pistols. FNU LNU stated that one pistol would be $900 and the other $800, but ████████ told UC2 that each pistol would cost $1,000, which included his seller's fee. GARCIA handed UC1 a grocery bag containing two clear plastic bags with the letter "E" writing in marker. GARCIA informed UC1 each bag had a pound of methamphetamine and had been weighed.

---

[2] ATF agents reviewed the bodycam footage of the stop. Both GARCIA and ████████ are identified in the stop based on the California Driver's license. During the stop, GARCIA was in the passenger seat. ████████ told officers during that traffic stop that he and GARCIA, as well ████████ ████████ who was also in the vehicle, were returning together from a trip to Texas.

15.     During the transaction, GARCIA informed UC1 he could provide UC1 with as much methamphetamine as UC1 wanted, and only required an 8-hour notice. GARCIA then provided UC1 with a 9mm pistol with one magazine. The UCs provided ███████ with $5,000 for the firearms ($2,000 for ████████'s pistol, $1,000 each for the two pistols provided by FNU LNU, and $1,000 for the pistol provided by GARCIA).



GARCIA PROVIDING UC WITH METHAMPHETAMINE

GARCIA COUNTING MONEY AFTER SALE



16.    After the buy, DEA agent Blake McEntire took the clear plastic bags into evidence and examined the substance contained in the bags, which he believed to be methamphetamine based on his training and experience and the appearance of the substance[3]. The methamphetamine was sent to the DEA lab for testing and has since been confirmed by the lab as methamphetamine. The methamphetamine sent to the lab had a net weight of 879.7g and a purity of 98% plus or minus 7%, according to a lab report from May 8, 2024.

_____

[3] Specifically, SA Blake McEntire has been a DEA agent since January 2023. He has investigated cases involving suspected methamphetamine and is familiar with how methamphetamine looks and feels. He has seen substances consistent with methamphetamine later be tested by a lab and be confirmed as methamphetamine.

**UC Purchase of 4 Firearms and Approximately 3 Pounds of Suspected Methamphetamine from ▓▓▓▓ and GARCIA**

17.    From February 13, 2024, to February 26, 2024, UC1 and ▓▓▓▓ engaged in recorded cell phone calls and text messages via ▓▓▓▓. ▓▓▓▓ texted UC1 pictures of AR15 rifles and stated that he would sell them for $2,000 each. ▓▓▓▓ and UC1 discussed that ▓▓▓▓ would be able to arrange a buy for firearms and narcotics. ▓▓▓▓ stated that he would meet with the seller of the firearms on February 23, 2024. UC1 agreed to purchase four AR15 rifles for $8,000, two M249 machine guns for $22,000, and three pounds of methamphetamine for $3,900.





PHOTO OF M249 SENT BY ▓▓▓▓

18.    On February 26, 2024, ███████ and GARCIA met both the UCs at a restaurant in Bakersfield, California to further discuss the deal. The UCs recognized ███████ and GARCIA from having met with them during the last buy. They were also shown pictures of ███████ and GARCIA again during the pre-buy briefing. As mentioned above, ███████ and UC1 had previously planned for the deal to entail the sale of four AR15 rifles, two M249 machine guns, and three pounds of methamphetamine. At the restaurant, GARCIA and ███████ gave the UCs more information about the logistics of the deal.

19.    ███████ proposed after meeting at the restaurant, they would all travel to a residence down the street and the UCs could examine the firearms there. ███████ stated UC1 would be able to examine the firearms and choose which firearms UC1 wanted to purchase. ███████ informed the UCs the individuals with the firearms were his associates and there was nothing to worry about. ███████ informed UC1 that if UC1 had any questions during the deal, UC1 should go through ███████ ███████ instructed UC1 to pay him, and in turn ███████ would pay the seller.

20.    GARCIA explained that after they left the restaurant, GARCIA, ███████ and the UCs would go to the residence of GARCIA's associates and see the firearms. GARCIA stated their associate dedicated himself to the acquisition and disposition of firearms. GARCIA told the UCs to trust the associate regarding this business, which the UCs understood to mean the sale of firearms and narcotics. GARCIA stated that his associate had possession of the M249's, and that the associate wanted to conduct the sale out of the associate's residence. GARCIA then left to verify that the firearms were at that location before the UCs went there. When he returned to the gas station, he reported that he did not see the firearms. Thus, the UCs declined the offer to go to the associate's residence to conduct the transaction.

21.    After the UCs declined, ███████ asked if UC1 still wanted to purchase the three pounds of methamphetamine. UC1 agreed. ███████ said he would retrieve the narcotics and meet the UCs at the gas station. ███████ told UC2 that ███████ would make $200 per pound for brokering the sale of

the methamphetamine. ███████ and GARCIA left the gas station a white Chevrolet Silverado bearing CA license plates 66648H3 to retrieve the suspected narcotics and then returned later. ATF surveillance observed the vehicle stop at 1100 Monique Avenue,

22.    ███████ arrived with GARCIA at the gas station in a white Chevrolet Silverado bearing CA license plates 66648H3 with a grocery bag containing the three pounds of suspected methamphetamine. ███████ exited the front passenger side door and brought the grocery bag to the UC vehicle. UC1 took the bag and examined the contents, three individual bags of suspected methamphetamine.

23.    During the deal, GARCIA observed a compartment that was installed in the UCs vehicle for concealing items and admired it. UC1 informed GARCIA that UC1 could build a similar compartment if GARCIA ever had the need. GARCIA inquired about pricing for a similar compartment in a Nissan. UC1 informed GARCIA it was dependent on the size and need of the compartment. GARCIA said the compartment would be used to move "Chingadera" and the size needed to be big enough to fit five kilograms. UC1 understood GARCIA to be referring to narcotics when he said "chingadera[4]."



GARCIA AT DEAL WITH ASSOCIATES ALEJANDRO GRANADOS AND PEDRO RANGEL

---

[4] UC1 has been an ATF agent for 9 years and has worked numerous narcotics investigations in that time. Before that, he worked for 8 years as a police officer. Through his years of experience, he has learned various slang terms commonly heard in these investigations.

COUNTING THE MONEY 1

24.    UC2 asked the total amount due for the suspected methamphetamine, in which ▮▮▮▮ stated $3,900. UC2 then counted $3,900 in cash and handed it to ▮▮▮▮ CHAVEZ took the funds and confirmed the total. After the suspected drug transaction, ▮▮▮▮ and GARCIA returned to their vehicle. ▮▮▮▮ stated that he would try to convince his seller to give him AR15's to sell to the UCs. ▮▮▮▮ and GARCIA left in their vehicle. ATF surveillance observed ▮▮▮▮ and GARCIA arrive at 1100 Monique Avenue, Bakersfield, California and walk towards the residence. Soon after, ▮▮▮▮ and GARCIA exited the residence with a black duffel bag. About twenty minutes later, ▮▮▮▮ and GARCIA returned to the gas station. ▮▮▮▮ exited the front passenger side of the Silverado and brought the duffel bag to the rear passenger seat of the UC vehicle. He unzipped the bag to reveal four rifles. ▮▮▮▮ confirmed that the firearms were "Ghost Guns[5]." ▮▮▮▮ stated that a different individual had the M249's and would not let them go. The UCs paid $8,000 for the firearms. ▮▮▮▮ counted $800 of the money out separately and put it in his pocket, stating that that portion of the money

---

[5] In my experience, a "Ghost Gun" is a firearm that is privately made and does not have a serial number.

was for him. ██████ stated he would try to do business and obtain an M249 and would let UC1 know if he was successful.

25.    After the buy, DEA agent Blake McEntire took the suspected controlled substance into evidence. Based on his training and experience, detailed above, SA McEntire believed the substance was consistent with methamphetamine. The methamphetamine was sent to the DEA lab for testing and has since been confirmed by the lab as methamphetamine. The methamphetamine sent to the lab had a net weight of 1351.7g and a purity of 100% plus or minus 7%, according to a lab report from March 19, 2024.

**Arrest of GARCIA and ██████Z on State Charges**

26.    ██████ continued to have telephonic contact with UC1 following the above described buys. On July 24, 2024, ██████ offered to sell the ATF UC two firearms and ten pounds of methamphetamine for $9500. ██████ agreed to meet at the Hampton Inn in Arvin, California. On August 12, 2024, ██████ arrived in a blue Hyundai Sonata with a previously unidentified person in the vehicle with him. Surveillance units captured a picture of the unknown person in the vehicle, who was later identified as MOISES HERNANDEZ (HERNANDEZ was arrested later, as described below. When he was arrested, Agents recognized him from seeing him at this buy on August 12th). ██████ sold UC1 and UC2 approximately 10 pounds of methamphetamine and a 9mm handgun.

27.    Following this, UC1 and ██████ planned a buy of 50 pounds of methamphetamine. ██████ and UC1 arranged to meet in the parking lot behind the Hampton Inn in Arvin, California. On September 5, 2024, at approximately 12:52 p.m., ██████ arrived at the buy location with another person, later identified as Moises HERNANDEZ. ██████ and HERNANDEZ were driving in a blue Hyundai Sonata which investigators recognized from previous deals as a vehicle that ██████ used. ██████ and HERNANDEZ exited the Sonata and were greeted by the UCs. UC1 and ██████ went to the trunk of the Sonata where ██████ retrieved a large bag. ██████ HERNANDEZ, and the UCs then got into the UC vehicle with the bag. UC2 exited the vehicle under the ruse of going to collect the

money from inside the hotel, and UC1 initiated the arrest signal to nearby Agents. ████ and HERNANDEZ were both arrested without incident.

28.    The bag provided by ████ contained six firearms, ammunition, and magazines (pictured below).





29.    ███████ spoke with investigators and agreed to talk to GARCIA on the phone, who he said was supposed to bring the methamphetamine. ███████ told GARCIA that he would meet him in the back of the hotel. At approximately 2:30 p.m., GARCIA arrived in the hotel parking lot in a white Chevrolet Silverado that investigators had seen him in previously. Agents approached the vehicle and arrested GARCIA, as well as associate Alberto CONTRERAS-DIAZ, who was also in the vehicle. GARCIA did not have the 50 pounds of methamphetamine.

### REQUEST TO SEAL

30.    This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the arrest warrants be sealed on the Court's docketing system.

31.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Rylee Smith, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone on  February 26, 2025 2025.

_____
Hon. Christopher D. Baker
United States Magistrate Judge

Reviewed as to form:

 /s/ *Arin C. Heinz*
ARIN C. HEINZ